No. 23-15157

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CIRRUS DESIGN CORPORATION,

*Plaintiff-Appellant*,

v.

GREAT WESTERN AIR, LLC d/b/a CIRRUS AVIATION SERVICES,

*Defendant-Appellee*.

On Appeal from the United States District Court
for the District of Nevada
Case No. 2:16-cv-02656-DJA

## APPELLEE'S RESPONSE BRIEF

MARK J. CONNOT
COLLEEN E. MCCARTY
FOX ROTHSCHILD LLP
1980 Festival Plaza Drive
Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
mconnot@foxrothschild.com
cmccarty@foxrothschild.com
*Attorneys for Defendant Great
Western Air, LLC d/b/a Cirrus
Aviation Services*

# <u>CORPORATE DISCLOSURE STATEMENT</u>

In accordance with Federal Rule of Appellate Procedure 26.1, Appellee Cirrus Aviation Services, LLC ("Cirrus Aviation") states that Great Western Air LLC, d/b/a Cirrus Aviation Services LLC is owned 1% by Greg Woods and 99% by 3 Woody's LLC. 3 Woody's LLC is owned 45% by Greg Woods, 45% by Mark Woods and 10% by Milt Woods. Other than Cirrus Aviation, undersigned counsel certifies that there are no known parties with a direct pecuniary interest in the outcome of this case.

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ............................................i

STATEMENT OF THE CASE ................................................. 1

    I.    STATEMENT OF THE FACTS ............................................. 1

        A.    Cirrus Aviation's Operations ........................................ 2

        B.    History of Cirrus Aviation ......................................... 4

        C.    Cirrus Design ..................................................... 7

    II.    PROCEDURAL HISTORY ...................................... 9

SUMMARY OF THE ARGUMENT ....................................... 12

STANDARD OF REVIEW ...................................... 14

ARGUMENT ................................................. 15

    I.    THE DISTRICT COURT DID NOT ERR IN GRANTING CIRRUS AVIATION'S REQUEST FOR A BENCH TRIAL. 15

        A.    Cirrus Design's Claims Seeking Equitable Remedies of Disgorgement of Profits and Injunctive Relief Provided No Right to Trial by a Jury ........................................ 16

        B.    The District Court Did Not Err by Relying on This Court's Clear Precedent in *Fifty-Six Hope Road Music* ...............................................................23

    II.    THE DISTRICT COURT APPLIED CORRECT STANDARDS IN ITS LIKELIHOOD OF CONFUSION ANALYSIS ........................................................26

        A.    The District Court Did Not Improperly Limit the Scope of its Confusion Analysis ...........................................26

            1.    The District Court Explicitly Analyzed Confusion in the Forms of Affiliation, Association, and Sponsorship ......................................................27

2. The District Court Considered in Detail All the Evidence that Cirrus Design Claims Demonstrates Likelihood of Confusion .............. 30

3. The District Court's References to "Source" and "Origin" Do Not Reflect Improper Application of Trademark Law ................................. 32

B. The District Court Properly Considered the *Sleekcraft* Factors ......................................................... 35

1. Strength of the Mark ......................................... 35

   a. Conceptual Strength ................................. 35

   b. Commercial Strength ................................. 35

      (i) *Commercial Strength in Context* ...... 35

      (ii) *Other Uses of "Cirrus" in Aviation* ... 37

2. Competitive Proximity of the Services ............... 40

   a. Cirrus Design Advocates for a Rote Disjunctive Test ......................................... 41

   b. Failing to Consider All Types of Confusion ................................................... 44

   c. The TTAB Proceeding ................................. 46

3. Similarity of the Marks ....................................... 48

4. Evidence of Actual Confusion ............................. 49

5. Marketing Channels Used .................................. 52

   a. Database Names ....................................... 53

   b. Similar Websites ....................................... 53

6. Types of Goods and Services and Degree of Care ................................................................. 55

7.    Intent ...................................................................... 58

      a.    The Relevant Facts ..................................... 59

      b.    Knowledge Alone is Insufficient ................ 61

      c.    Events Prior to 2010 .................................. 63

8.    Likelihood of Expansion ..................................... 64

C.    Weighing the *Sleekcraft* Factors .................................. 66

D.    Cirrus Design is Not Entitled to an Injunction ........... 67

CONCLUSION ......................................................................... 69

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allstate Ins. Co. v. Kia Motors Am., Inc.,*
    784 F. App'x 507 (9th Cir. 2019) .......................................... 66

*Amstar Corp. v. Domino's Pizza, Inc.,*
    615 F.2d 252 (5th Cir. 1980), *cert. denied,* 449 U.S. 899
    (1980) ........................................................................................ 39

*Bostic v. Goodnight,*
    443 F. 3d 1044 (8th Cir. 2006) ............................................ 22

*Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.,*
    174 F.3d 1036 (9th Cir. 1999) .................................... *passim*

*Cairns v. Franklin Mint Co.,*
    24 F. Supp. 2d 1013 (C.D. Cal. 1998) ................................ 50

*Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry,*
    494 U.S. 558 (1990) ............................................... 18, 19, 20

*Checkpoint Sys., Inc. v. Check Point Software Tech.,*
    269 F.3d 270 (3d Cir. 2001) ................................................ 36

*City of Monterey v. Del Monte Dunes at Monterey, Ltd.,*
    526 U.S. 687 (1999) .............................................................. 16

*Cohn v. Petsmart, Inc.,*
    281 F.3d 837 (9th Cir. 2002) .............................................. 49

*Craig v. Atl. Richfield Co.,*
    19 F.3d 472 (9th Cir. 1994) ................................................ 16

*Dairy Queen Inc. v. Wood,*
    369 U.S. 469 (1962) ....................................... 21, 22, 24, 25

*Eclipse Assoc. Ltd. v. Data Gen. Corp.,*
    894 F.2d 1114 (9th Cir. 1990) ............................................ 42

*Entrepreneur Media, Inc. v. Smith,*
　　279 F.3d 1135 (9th Cir. 2002) ........................................... 44

*Fair Isaac Corp. v. Fed. Ins. Co.,*
　　408 F. Supp. 3d 1019 (D. Minn. 2019) ............................... 25

*Feltner v. Columbia Pictures Television, Inc.,*
　　523 U.S. 340 (1998) ............................................... 20, 22, 25

*Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.,*
　　778 F.3d 1059 (9th Cir. 2015) .................................... *passim*

*Flathead-Lolo-Bitterroot Citizen Task Force v. Montana,*
　　98 F.4th 1180 (9th Cir. 2024) ........................................... 67

*Fleishmann Distilling Corp. v. Maier Brewing,*
　　314 F.2d 149 (9th Cir. 1963) ............................................. 34

*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand
　　Mgmt., Inc.,*
　　618 F.3d 1025 (9th Cir. 2010) ........................................... 58

*Fuller Brush Prods. Co. v. Fuller Brush Co.,*
　　299 F.2d 772 (7th Cir.), *cert. denied*, 370 U.S. 923 (1962) ................ 20

*Gen. Mills, Inc. v. Kellogg Co.,*
　　824 F.2d 622 (8th Cir. 1987) ............................................. 39

*Gucci Am., Inc. v. Weixing Li,*
　　768 F.3d 122 (2d Cir. 2014) ............................................. 22

*Hamilton-Brown Shoe Co. v. Wolf Bros. & Co.,*
　　240 U.S. 251 (1916) ...................................................... 19

*Hard Candy, LLC v. Anastasia Beverly Hills, Inc.,*
　　921 F.3d 1343 (11th Cir. 2019) ......................................... 22

*Homeowners Group, Inc. v. Home Mktg. Specialists, Inc.,*
　　931 F.2d 1100 (6th Cir. 1991) ........................................... 36

*Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC,*
　823 F.3d 153 (2d Cir. 2016) ......................................................... 32, 33

*Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC,*
　No. 3:10-cv-01234 (MPS), 2014 WL 3891287 (D. Conn. Aug. 7, 2014) ..................................................................................... 32

*Interstellar Starship Servs., Ltd. v. Epix, Inc.,*
　304 F.3d 936 (9th Cir. 2002) ....................................................... 14, 55

*Ironhawk Techs., Inc. v. Dropbox, Inc.,*
　2 F.4th 1150 (9th Cir. 2021) ............................................. 41, 51, 54, 63

*JL Beverage Co., LLC v. Jim Beam Brands Co.,*
　815 F. App'x 110 (9th Cir. 2020)...................................... 12, 15, 26, 35

*Johnson v. Gardner,*
　179 F. 2d 114 (9th Cir. 1949), *cert. denied*, 339 U.S. 935 (1950)......................................................................................................... 14

*Kirshner v. Uniden Corp. of America,*
　842 F.2d 1074 (9th Cir. 1988) .............................................................. 49

*M2 Software, Inc. v. Madacy Ent.,*
　421 F.3d 1073 (9th Cir. 2005)....................................................... 39, 61

*Marketquest Grp., Inc. v. BIC Corp.,*
　862 F.3d 927 (9th Cir. 2017)..................................................... *passim*

*Markman v. Westview Instr., Inc.,*
　517 U.S. 370 (1996).............................................................................. 18

*Merriam-Webster, Inc. v. Random House, Inc.,*
　35 F.3d 65 (2d Cir. 1994) .................................................................... 51

*Nabisco, Inc. v. PF Brands, Inc.,*
　191 F.3d 208 (2d Cir. 1999) ................................................................ 50

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*
422 F.3d 782 (9th Cir. 2005) ............................................................. 67

*Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*,
638 F.3d 1137 (9th Cir. 2011) ...................................................... 41, 53

*Nutri/Sys., Inc. v. Con-Stan Indus., Inc.*,
809 F.2d 601 (9th Cir. 1987) ....................................................... 42, 43

*One Indus., LLC v. Jim O'Neal Distrib. Inc.*, 578 F.3d 1154
(9th Cir. 2009) ...................................................................................... 61

*Perfumebay.com Inc. v. eBay, Inc.*,
506 F.3d 1165 (9th Cir. 2007) ........................................................... 14

*Playboy Enterpr., Inc. v. Netscape Commc'ns Corp.*,
55 F. Supp. 2d 1070 (C.D. Cal. 1999), *aff'd* 202 F.3d 278
(9th Cir. 1999) ...................................................................................... 50

*Pyrodyne Corp. v. Pyrotronics Corp.*,
847 F.2d 1398 (9th Cir. 1988) ........................................................... 67

*Rearden LLC v. Rearden Com., Inc.*
683 F.3d 1190 (9th Cir. 2012) .................................................. *passim*

*Reebok Int'l, Ltd. v. Marnatech Enters., Inc.*,
970 F.2d 552 (9th Cir. 1992) ............................................................. 20

*Reno Air Racing Ass'n, Inc. v. McCord*,
452 F.3d 1126 (9th Cir. 2005) ..................................................... 14, 66

*Romag Fasteners, Inc. v. Fossil, Inc.*,
590 U.S. 212 (2020) ........................................................................... 19

*Rutledge v. Electric Hose & Rubber Co.*,
511 F. 2d 668 (9th Cir. 1975) ........................................................... 14

*S.E.C. v. Rind*,
991 F.2d 1486 (9th Cir. 1993) ........................................................... 20

*Scarves by Vera, Inc. v. Todo Imps. Ltd. Inc.*,
544 F.2d 1167 (2d Cir. 1976) ...................................................... 39, 40

*Shubin v. U.S. Dist. Ct. for S.D. Cal.*,
   313 F.3d 250 (9th Cir. 1963) ............................................... 18

*Sid & Marty Krofft Television Prods. Inc. v. McDonald's Corp.*,
   562 F.2d 1157 (9th Cir. 1977) ....................................... 23, 25

*Siegel v. Warner Bros. Entm't Inc.*,
   581 F. Supp. 2d 1067 (C.D. Cal. 2008) .............................. 25

*AMF Inc. v. Sleekcraft Boats*,
   599 F.2d 341(9th Cir. 1979) ........................................ 45, 55

*Smith v. Barton*,
   914 F.2d 1330 (9th Cir. 1990) ............................................ 20

*Surfvivor Media, Inc. v. Survivor Prods.*,
   406 F.3d 625 (9th Cir. 2005) ............................................. 63

*Swofford v. B & W, Inc.*,
   336 F.2d 406 (5th Cir. 1964) ....................................... 23, 24

*Toyota Motor Sales, U.S.A., Inc. v. Tabari*,
   610 F.3d 1171 (9th Cir. 2010) ........................................... 17

*Tull v. United States*,
   481 U.S. 412 (1987) .............................................. 18, 19, 20

## Statutes

15 U.S.C. §§ 1051 *et seq.* ..................................................... 17

15 U.S.C. § 1125(a)(1)(A) ...................................................... 27

Lanham Act .............................................................. *passim*

NEV. REV. STAT. Ch. 598 ...................................................... 17

## Other Authorities

U.S. Const., Amendment VII, Seventh Amendment ...................... *passim*

Fed. R. Civ. P. 38 ................................................................ 16

Fed. R. Civ. P. 39.................................................................... 16

2 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 11:77 (5th ed. 2022)..................................... 36

Restatement (Third) of Restitution and Unjust Enrichment § 51 cmt. a (2011)............................................................ 19

<u>**STATEMENT OF THE CASE**</u>

## I.  STATEMENT OF THE FACTS

This is a trademark infringement action involving two participants in the aviation industry that operate in two entirely separate spheres. Appellant Cirrus Design Corporation[1] ("Cirrus Design") is an airplane manufacturer that designs and sells single-engine personal aircraft to people who want to pilot their own planes. 4-ER-646–47. Appellee Cirrus Aviation Services, LLC ("Cirrus Aviation") is a high-end charter airline that offers luxury private jet travel for people who want to be pampered passengers. 3-ER-287. While they share the same name—Cirrus—taken from the high-altitude, wispy cloud that signifies good flying weather— the similarities between the two companies begin and end there. Cirrus Aviation's passengers purchase a ticket on a charter airline that flies large aircraft with two engines and two pilots. 3-ER-323, 348. Cirrus Design's customers buy their own small plane, then fly it themselves. *Id.*

---

[1] Appellant refers to itself in this litigation using the d/b/a "Cirrus Aircraft." The district court generally used that name for Cirrus Design as well.

### A. Cirrus Aviation's Operations

Cirrus Aviation is a Part 135 charter operator based in Las Vegas, Nevada that provides private flights for "the one percent of the one percent," meaning the very wealthy. 3-ER-287. The Federal Aviation Administration ("FAA") permits holders of a Part 135 air carrier certificate, based on 14 C.F.R. Part 135, to conduct flight operations throughout the United States and most of the world. 3-ER-280. Cirrus Aviation's clientele of ultra-high-net-worth individuals includes entrepreneurs and business executives, professional athletes, and celebrities—people who value customized, no-hassle travel and have the means to pay for it. 3-ER-294–95. Passengers on Cirrus Aviation flights choose when they want to fly, who they want to fly with, and what amenities they want on board. 3-ER-286–87, 294–96. Purchasers can expect to pay between $8,000 and $340,000 per trip. 3-ER-316–19. Pricing is dependent on each passenger's unique needs, like the size of the plane, the destination, and the length of stay. 3-ER-317.

At the time of trial, Cirrus Aviation had more than 30 planes in its fleet. 3-ER-290. These aircraft include large, ultra-long-range jets like the Gulfstream G550, heavy jets like the Challenger 850, and mid-weight

jets like the Learjet 60XR and Hawker 900XP, to name a few. 3-ER-296, 328-329. Every plane in Cirrus Aviation's fleet has two engines and its coveted Argus Platinum safety rating requires two pilots on every flight. 3-ER-323. Depending on the plane, seating options range from six passengers to up to twelve passengers, not including the pilots. 22-ER-4457–59.

By contrast, Cirrus Design manufactures small, personal aircraft for people who like to fly their own airplanes. 3-ER-293. The SR20 and SR22, both single-engine piston propeller aircraft, seat four or five people, including the pilot. 8-ER 1589. Cirrus Design also manufactures the single-engine SF 50 Vision Jet, which seats five adults, including the pilot, and two children. *Id.*

Given their small size and short range, no planes manufactured by Cirrus Design are used in Cirrus Aviation's charter services. 3-ER-293. Cirrus Aviation has never and will never include Cirrus Design planes in its fleet. 4-ER-478. For a visual perspective of just how different the relevant aircraft are, the entire cabin of Cirrus Design's largest aircraft, the Vision Jet, would fit inside one engine of the Gulfstream G550 in Cirrus Aviation's fleet. 3-ER-296.

Cirrus Aviation's passengers rarely book their flights directly with the company. Instead, some 90% of flights are sold to intermediaries, like charter brokers casino transportation specialists, sports teams, or artist management companies. 3-ER-303, 311–13. The remaining 10% of its business comes through local referral networks and Cirrus Aviation fleet owners. 3-ER-313.

Cirrus Aviation's business consists of operating charter flights, managing the aircraft that are used in their charter operations, and assisting with the acquisition of aircraft to be used as part of its charter fleet. 18-ER-4433–68. Cirrus Aviation provides the attendant aircraft management services for the planes in its fleet, including the pilots, maintenance, and storage. 3-ER-289-290. And, when the owner is not using the plane, Cirrus Aviation uses it to fly other customers and the owner earns money in return. 3-ER-285, 288–89.

## B.    History of Cirrus Aviation

Cirrus Aviation is family-owned by Milt Woods and his sons, Greg and Mark. 23-ER-4633. Milt Woods spent his career in the aviation industry, beginning as a commercial pilot in the 1960s. 3-ER-271–72. Decades later in 1994, Milt Woods pivoted and started his own aircraft

management company in the state of Washington. 3-ER-272; 23-ER-4633. He named the company Cirrus Aviation Services, Inc. after the wispy cloud that promises good flying weather. 3-ER-283; 6-ER-952. Cirrus Aviation Services Inc. provided flying services and aircraft maintenance, among other things. 3-ER-272. It also managed a Canadian charter company that operated under the Canadian equivalent of a Part 135 certificate. 3-ER-272–75. At the time Cirrus Aviation Services was incorporated on December 12, 1994, neither Milt, Greg, nor Mark Woods had any knowledge of Cirrus Design. 3-ER-275, 359. That was not surprising because Cirrus Design was still in its relative infancy and had yet to be awarded any trademarks. 10-ER-1938.

In the early 2000's, Cirrus Aviation Services, Inc. purchased a minority stake in another charter services company, Eagle Jet Aviation. 3-ER-278. Cirrus Aviation Services, Inc. continued to offer charter services through Eagle Jet until 2007. *Id.*

Thereafter, Cirrus Aviation Services, Inc. began to broker charter flights in May 2007. 3-ER-278–79. It continued to broker charter flights for the next several years. *Id.* Cirrus Aviation Services, Inc. was not the air carrier for the flights, but the flights operated under the Part 135

certificates of other companies. *Id*. In 2008, Milt Woods, joined by his sons, began searching for an existing FAA Part 135 certificate to purchase. 3-ER-280.

In 2009, through a separate LLC, the Woods family purchased Great Western Air, LLC ("Great Western Air"), including its Part 135 certificate. 3-ER-282. Because the previous owner of Great Western Air had other companies using a similar name, the Woods family agreed to select a different name. 3-ER-282. They registered Great Western Air as a foreign entity doing business in Nevada under the name "Cirrus Aviation Services"—the name Milt Woods had begun using in 1994. *Id*. When the family decided to use the "Cirrus Aviation Services" name for the newly acquired company, it did so because Milt Woods was proud of the name he had been using for his other businesses since 1994, wanted to keep it to maintain his customer base, and liked the association with the cloud. 3-ER-283. Before settling on that name, Greg Woods consulted the Air Charter Guide to see if any other Part 135 charter operators were using the name Cirrus and did not find any. 3-ER-283, 432. While the Woods family was aware of Cirrus Design as of 2010, they did not believe the company that manufactured small single-engine piston propeller

airplanes for hobby pilots had any connection to the luxury charter airline industry in which they operated. 3-ER-432. After acquiring Great Western Air, the Woods Family began offering and rendering services in the name of Cirrus Aviation Services, LLC. *Id.* Cirrus Aviation performed its first flight as a Part 135 charter operator in February 2010. 3-ER-280. At the time of trial, Cirrus Aviation had flown some 40,000 unique passengers. 3-ER-329.

## C. Cirrus Design

Alan Klapmeier was the CEO of Cirrus Design for the majority of its existence, from 1984 until 2008. 4-ER-633–35. At the time that Appellant chose the "Cirrus Design" name, Alan Klapmeier was aware of many other entities that used the name Cirrus. 4-ER-638–39. For example, when he chose the Cirrus Design name, Alan Klapmeier was aware of an existing company in Blaine, Minnesota called Cirrus Flight Operations that provided charter flight operations and aircraft management. 4-ER-665–66. Mr. Klapmeier had no concerns regarding any confusion between the two because Cirrus Design built airplanes and Cirrus Flight Operations, as a fixed-base operator, provided airport

aeronautical services including refueling, maintenance, flight training and charter services. 4-ER-581–88, 669–70.

Indeed, throughout Alan Klapmeier's tenure, Cirrus Design failed to enforce its alleged marks and largely ignored other businesses in both aviation and other fields using the "Cirrus" name. 4-ER-672–73. For example, when Chrysler released a vehicle called the Chrysler Cirrus, Mr. Klapmeier had no concerns regarding customer confusion. 4-ER- 672. From his perspective, a car manufacturer and an aircraft manufacturer operated in two separate spheres and were not competitors. 4-ER-671. Similarly, Mr. Klapmeier became aware of a flight school in Oregon that used the name "Cirrus." 4-ER-670. Again, Mr. Klapmeier took no action to enforce the mark, noting "that would be hypocrisy on my part," given his awareness of Cirrus Flight Operations' prior to Cirrus Design's use of the name "Cirrus". 4-ER-671.

During his 25 years as CEO of Defendant, Alan Klapmeier never had any indication that anyone confused Cirrus Design with Cirrus Aviation. 4-ER-673.

Because of their small size and short range, Cirrus Design has long recognized that its aircraft are unsuitable for Part 135 charter operations

and did not seek to expand into the charter airline market. 4-ER-651-652, 654–55. Since 2011, Cirrus Design's ultimate owner, through subsidiaries, has been the government of China. 4-ER-564; 5-ER-799. Because FAA regulations do not permit companies with more than 25% foreign ownership to hold a Part 135 certificate, a fundamental obstacle would prevent Cirrus Design from operating charter flights even if it was to develop an interest in doing so. *Id*. Cirrus Design does not and cannot hold a Part 135 certificate. 4-ER-661–63.

## II.  PROCEDURAL HISTORY

Prior to commencement of this litigation, Cirrus Design applied to obtain registration of the CIRRUS mark for an expanded group of goods and services that included "Providing Supplemental Lift Scheduling in the Nature of Scheduling Alternate Flights or Charter Flights" and "Business Management Services in Nature of Private Aircraft Management Services…" 10-ER-1961–74.

Out of concern that Cirrus Design was attempting to obtain trademark rights within the separate sphere of charter operations, on June 17, 2015, Cirrus Aviation filed a Notice of Opposition to Cirrus Design's requested registration with the Trademark Trial and Appeal

Board ("TTAB"). 10-ER-2039–54. Cirrus Aviation asserted first that with respect to its goods and services, it had valid common law rights in the trademarks at issue. *Id.* Second, Cirrus Aviation argued that if Cirrus Design was to expand into the separate sphere of charter operations and related services, where it had never operated, it could cause confusion in the marketplace. *Id.* Greg Woods further explained at trial, "we're contesting their expansion from being a manufacturer to being an airline." 3-ER-348. In response to Cirrus Aviation's Notice of Opposition, Cirrus Design denied any confusion. 10-ER-2056–61. The proceedings before the TTAB have been stayed for more than seven years, pending resolution of the instant litigation and appeal. 8-ER-1508–09.

Cirrus Aviation filed a Complaint for Declaratory Judgment of Non-Infringement on November 18, 2016, which was later amended. *See generally* 9-ER-1803–14. In the Complaint, Cirrus Design then timely filed its Amended Answer and Counterclaims against Cirrus Aviation. 9-ER-1784–1803.

On August 26, 2022, Cirrus Aviation brought an Omnibus Motion in Limine, which sought, in part, to exclude evidence from the jury on the basis that a trial by jury was unavailable. 8-ER-1470–1586. On

September 6, 2022, Cirrus Aviation brought a Motion to Withdraw its Jury demand and Strike the Jury demand of Cirrus Design. 7-ER-1296–1303.

The case proceeded to a bench trial held in September 2022 before United States Magistrate Judge Daniel J. Albregts. 3-ER-226–455; 4-ER-457–692; 5-ER-694–898; 29-ER-5760–5953. The district court received four days of testimony. Thereafter the district court issued a trial order, holding Cirrus Design failed to meet its burden of proving its entitlement to damages or injunctive relief. The district court entered judgment in favor of Cirrus Aviation. 1-ER-8–33.

Cirrus Design moved to amend or add findings and for a new trial, arguing that the district court erred in both its factual findings and legal conclusions, and erred in striking Cirrus Design's jury demand. 2-ER-199–224. That same day, Cirrus Design filed its notice of appeal to this Court. 28-ER-5724–26. The district court subsequently denied Cirrus Design's post-judgment motion. 1-ER-2–7.

## SUMMARY OF THE ARGUMENT

Cirrus Design and Cirrus Aviation offer very different things to the public, sell them to very different groups of customers, and organize their businesses around very different types of aircraft. At a bench trial, the district court received the parties' evidence and evaluated the credibility of their witnesses. Then, in a detailed and thoughtful trial order, the district court determined that Cirrus Design could not meet its burden of establishing likelihood of confusion. The trial order reflects the district court's careful application of this Court's precedent to the factual record.

On appeal, Cirrus Design first insists that the district court wrongly struck its jury demand, but its argument is contrary to the plain and controlling precedent in this Court. *Fifty-Six Hope Road Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1074–1076 (9th Cir. 2015); *JL Beverage Co., LLC v. Jim Beam Brands Co.*, 815 F. App'x 110, 112 (9th Cir. 2020). Cirrus Design is forced to rely on arguments that have failed many times before, in this Court and elsewhere, to claim that the district court erred. It did not.

Cirrus Design's second main argument is that the district court failed to consider some types of confusion and failed "to account for" what

Cirrus Design characterizes as ample supporting evidence. The trial order shows otherwise on its face. In that order, the district court plainly understood and considered that confusion can exist as to affiliation, sponsorship, or association as well as source or origin. The district court also considered—at length and in detail—all the purported evidence of confusion that Cirrus Design presented, including supposed evidence of confusion among non-consumers. Thus, it is not the case that the district court overlooked Cirrus Design's arguments; it just disagreed with them.

This case, filed in 2016, has continued for long enough. Cirrus Design had a full and fair opportunity to be heard at trial. The district court did not abuse its discretion (or, indeed, make any error at all) when it struck Cirrus Design's jury demand. None of Cirrus Design's arguments about likelihood of confusion or the *Sleekcraft* factors identify anything approaching a clear error that would justify reversal of the trial order. The decisions of the district court should be affirmed in all respects.

## STANDARD OF REVIEW

In a trademark dispute, the Court reviews for clear error the district court's "legal and factual determination of likelihood of confusion under the trademark laws," including the district court's application of the likelihood of confusion factors to the facts of the case. *Interstellar Starship Servs., Ltd. v. Epix, Inc.*, 304 F.3d 936, 941 (9th Cir. 2002); *see also Perfumebay.com Inc. v. eBay, Inc.*, 506 F.3d 1165, 1172–73 (9th Cir. 2007); *Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1135 (9th Cir. 2005).

Review of a motion to strike a jury demand made under Rule 39(b) is to be sustained unless an abuse of judicial discretion is shown. *Rutledge v. Electric Hose & Rubber Co.*, 511 F. 2d 668, 675 (9th Cir. 1975); *Johnson v. Gardner*, 179 F. 2d 114, 118 (9th Cir. 1949), *cert. denied*, 339 U.S. 935 (1950).

## ARGUMENT

## I. THE DISTRICT COURT DID NOT ERR IN GRANTING CIRRUS AVIATION'S REQUEST FOR A BENCH TRIAL

The district court did not err by striking Cirrus Design's demand for a jury trial where Cirrus Design had no Seventh Amendment right to a jury trial under the Lanham Act on its claims for disgorgement of profits, injunctive relief, and recovery of fees and costs, as clearly established by this Court's binding precedent. *Fifty-Six Hope Road Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1074–1076 (9th Cir. 2015). Moreover, as the district court correctly recognized in reaching its determination, this Court recently affirmed a district court's decision to strike a jury demand in *JL Beverage Co., LLC*, under circumstances nearly identical to those here. 815 F. App'x 110. *See also* SER-50. There, in reliance on *Fifty-Six Hope Road Music*, the court correctly held that where the remedy being sought was the disgorgement of profits, "'[a] claim for disgorgement of profits under § 1117(a) is equitable, not legal' and thus does not 'invoke [ ] [the] right' to a jury trial.'" *JL Beverage Co.*, 815 F. App'x at 112 (quoting *Fifty-Six Hope Rd. Music*, 778 F.3d 1074–76). Similarly, here, the district court properly struck the jury demand

upon the finding that Cirrus Aviation properly withdrew its jury trial consent and where Cirrus Design sought only equitable relief.

**A.  Cirrus Design's Claims Seeking Equitable Remedies of Disgorgement of Profits and Injunctive Relief Provided No Right to Trial by a Jury**

Rules 38 and 39 of the Federal Rules of Civil Procedure govern the procedural requirements regarding a right to a jury trial. Under Rule 38, a party may demand a jury trial on "any issue triable of right by a jury." Fed. R. Civ. P. 38(b). Rule 38(a) only preserves the right to a jury trial "as declared by the Seventh Amendment to the Constitution or as given by a statute of the United States." Fed. R. Civ. P. 38(a); *see also Craig v. Atl. Richfield Co.*, 19 F.3d 472, 476–77 (9th Cir. 1994). Under Rule 39, a "trial on all issues demanded must be by jury unless the court, on motion or on its own, finds that on some or all of those issues there is no federal right to a jury trial." Fed. R. Civ. P. 39(a)(2).

Determining whether a party has the right to a jury trial is a two-step process. First, the district court must review whether the statutory authority underlying plaintiff's claims authorizes a jury trial. *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999). If it does, that ends the inquiry. *See* Fed. R. Civ. P. 38(a). However, if the

statute does not guarantee a jury trial, the district court must examine whether the case qualifies as a "suit[] at common law" under the Seventh Amendment, which is broadly defined as a "statutory claim[] that [is] legal … as opposed to equitable" in nature. *Id.*

Here, the district court correctly concluded that none of the statutes under which the parties' asserted claims provided for a right to trial by jury. Cirrus Design sought disgorgement of profits and injunctive relief, asserting claims of trademark infringement and unfair competition that were asserted under the Lanham Act. The statutory text of the Lanham Act does not, by itself, provide for the right to a jury trial—the word "jury" does not even appear in the Act. *See generally* 15 U.S.C. §§ 1051 *et seq.*; *see also Fifty-Six Hope Rd. Music*, 778 F.3d at 1074–76 ("the Lanham Act itself does not create a right to a jury trial"). The same is true of the Nevada Deceptive Trade Practices Act. *See generally* NEV. REV. STAT. Ch. 598. Cirrus Aviation's own claims sought declarations of non-infringement of the trademarks of Cirrus Design. As such, no claim asserted by either party gave rise to a right of trial by jury. *See Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1184 (9th Cir. 2010)

(citing *Shubin v. U.S. Dist. Ct. for S.D. Cal.*, 313 F.3d 250, 251–52 (9th Cir. 1963)).

As a consequence, the district court next reached the correct answer to the constitutional question. The Seventh Amendment provides that "[i]n suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved . . ." U.S. Const., Amendment VII. The phrase "suits at common law" as used in the Seventh Amendment "refers to suits in which *legal* rights are to be ascertained and determined, in contradistinction to those where equitable rights alone are recognized, and equitable remedies are administered." *Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 564 (1990) (quote omitted; emphasis in original); *see also Markman v. Westview Instr., Inc.*, 517 U.S. 370, 375–76 (1996). To determine whether a particular action resolves legal rights, a court must look at both the nature of the issues involved and the remedy sought. *Terry*, 494 U.S. at 565; *see also Tull v. United States*, 481 U.S. 412, 417–18 (1987). "First, we compare the statutory action to 18th-century actions brought in the courts of England prior to the merger of the courts of law and equity. Second, we examine the remedy sought and whether it is

legal or equitable in nature." *Id.* The "remedy" inquiry is the more important of the two. *Terry*, 494 U.S. at 565.

In early trademark cases, disgorgement of profits—also referred to as an "accounting" of profits—was a well-established remedy awarded by courts of equity. Restatement (Third) of Restitution and Unjust Enrichment § 51 cmt. a (2011). The Supreme Court explained that the remedy is based on the legal fiction of the trust *ex maleficio*, a constructive trust in which a holder of property is recognized to have obtained that property by wrongful means. *Hamilton-Brown Shoe Co. v. Wolf Bros. & Co.*, 240 U.S. 251, 259 (1916). The Court's theory was that a trademark infringer wrongfully benefits by using property owned by the trademark owner—namely, the mark—and so a defendant who is liable in a trademark infringement action may be deemed to hold its profits in constructive trust for the plaintiff. *Id.* In trademark cases, "[t]he infringer [was] required in equity to account for and yield up his gains to the true owner." *Id.* at 272; *see also generally Romag Fasteners, Inc. v. Fossil, Inc.*, 590 U.S. 212, 215–18 (2020).

Consistent with this historical analysis, both this Court and the Supreme Court have long recognized that disgorgement of profits is

equitable in nature. *Fifty-Six Hope Rd. Music*, 778 F.3d at 1074–76; *see also Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 352 (1998) (observing that the Supreme Court has described "actions for disgorgement of improper profits" as "equitable"); *Tull*, 481 U.S. at 424 (stating that "an action for disgorgement of improper profits" is "traditionally considered an equitable remedy"); *S.E.C. v. Rind*, 991 F.2d 1486, 1493 (9th Cir. 1993) ("[A]ctions for disgorgement of improper profits are equitable in nature."); *Smith v. Barton*, 914 F.2d 1330, 1337 (9th Cir. 1990) ("[D]amages may be equitable where they are restitutionary, 'such as in action[s] for disgorgement of improper profits.'" (quoting *Terry*, 494 U.S. at 570). Similarly, "[a]n accounting of profits under § 1117(a) is not synonymous with an award of monetary damages: '[a]n accounting for profits … is an equitable remedy subject to the principles of equity.'" *Reebok Int'l, Ltd. v. Marnatech Enters., Inc.*, 970 F.2d 552, 559 (9th Cir. 1992) (quoting *Fuller Brush Prods. Co. v. Fuller Brush Co.*, 299 F.2d 772, 777 (7th Cir.), *cert. denied*, 370 U.S. 923 (1962)).

As a threshold matter, there is no reasonable dispute that the only monetary damages sought by Cirrus Design were in the form of disgorgement of profits from Cirrus Aviation. Op. Br. at 11; 9-ER-1784–

1801, 1857–74. Cirrus Design's operative complaint requested a judgment "[r]equiring Counter-Defendant to pay to Cirrus Design its profits earned under the trademark and business name CIRRUS AVIATION SERVICES, as well as any and all other amounts specifically allowed under federal or state law." 9-ER-1800. Tellingly, when opposing Cirrus Aviation's motion to withdraw its jury demand and strike Cirrus Design's jury demand, Cirrus Design did not dispute, and the district court clearly understood, that the only form of monetary damages it was seeking was the disgorgement of profits. SER-32–51. Most importantly, Cirrus Design's trial presentation did not include the presentation of any evidence of actual damages. 3-ER-226–455; 4-ER-457–692; 5-ER-694–898; 29-ER-5760–5953.

Cirrus Design now asserts, relying on *Dairy Queen Inc. v. Wood*, 369 U.S. 469 (1962), that it was entitled to a jury trial because it was seeking to recover Cirrus Aviation's profits as a proxy for the damages it purportedly suffered due to infringement. Op. Br. at 18. This and other courts have soundly rejected this argument. In *Dairy Queen*, a restaurant company sued a franchisee for breach of contract and trademark infringement and sought "an accounting to determine the exact amount

of money owing by [the franchisee in breach] and a judgment for that amount," along with injunctive relief. *Id.* at 475. Even though the plaintiff had framed the claim as one for an accounting, the Supreme Court reasoned, that the real request was for damages. *Id.* at 477–78. After all, there was no claim for disgorgement, and the district court had already planned to resolve the equitable claims later. *Id.*, 369 U.S. at 476–80. Thus, *Dairy Queen* was in reality just an ordinary "action for damages for trademark infringement 'subject to cognizance by a court of law.'" *Feltner*, 523 U.S. at 346 (quoting *Dairy Queen*, 369 U.S. at 477 ).

Further, multiple circuit court cases have confirmed that the *Dairy Queen* case did not find disgorgement of profits to be a legal remedy. *Fifty-Six Hope Rd. Music*, 778 F.3d at 1075; *see also Hard Candy, LLC v. Anastasia Beverly Hills, Inc.*, 921 F.3d 1343, 1357–58 (11th Cir. 2019); *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 132–33 (2d Cir. 2014); *Bostic v. Goodnight*, 443 F. 3d 1044, 1048–49 (8th Cir. 2006). Cirrus Design's reliance on *Dairy Queen* for the proposition that it was entitled to a jury trial on its claim for disgorgement of profits, therefore, is wholly misplaced. It is well-settled that disgorgement when no actual damages

exist is solely an equitable remedy, the adjudication of which rests with the district court alone.

## B. The District Court Did Not Err by Relying on This Court's Clear Precedent in *Fifty-Six Hope Road Music*

Cirrus Design next argues, incorrectly, that this Court's opinion in *Fifty-Six Hope Road Music* was wrongly decided and in violation of the prior precedent rule. Op. Br. at 21. In support, Cirrus Design asserts that the three-judge panel considering *Fifty-Six Hope Road Music* deviated from the decision in *Sid & Marty Krofft Television Prods. Inc. v. McDonald's Corp.*, 562 F.2d 1157 (9th Cir. 1977), which held that a plaintiff has a right to a jury trial when seeking an accounting of profits in a copyright infringement action. Op. Br. at 20. This argument is equally unavailing.

The court in *Krofft* never decided whether disgorgement of profits in a trademark infringement case was subject to jury determination. The jury in *Krofft* had already determined plaintiff's actual damages, and the court then ruled that the parties had agreed and intended that the court, not the jury, would determine disgorgement of profits. *Krofft*, 562 F.2d at 1175. In not deciding the issue, the *Krofft* court quoted with approval a Fifth Circuit patent infringement case, *Swofford v. B & W, Inc.*, 336 F.2d

406 (5th Cir. 1964). The *Swofford* court correctly interpreted *Dairy Queen* as holding that when a case presents both legal and equitable issues, the factual issues common to each are tried to a jury. *Swofford*, 336 F.2d at 414. Importantly for the instant appeal, the *Swofford* court further concluded its analysis by noting that *Dairy Queen* had not "converted typical non-jury claims, or remedies, into jury ones." *Id*. Thus, this Court did not determine whether disgorgement of profits in a trademark infringement case was subject to jury determination until its decision in *Fifty-Six Hope Road Music*. This Court's holding in *Fifty-Six Hope Road Music*, therefore, did not violate the prior precedent rule. As noted by Circuit Judge Michelle T. Friedland in the concurring opinion, "we have no occasion in this trademark case to decide the applicability of the jury trial right in copyright cases." *JL Beverage Co., LLC*, 815 F. App'x 110 at 117. The district court properly followed the controlling precedent of this Court in trademark infringement cases when concluding that Cirrus Design was not entitled to a jury trial on its equitable claims seeking disgorgement of profits or any attendant injunctive relief.

The concurring opinion highlighted reasons why *Krofft*—in addition to being an inapplicable copyright decision—has been criticized

in succeeding decades. Indeed, Judge Friedland expressed the view that *Krofft* was wrongly decided. *Id.* at 114. The concurring opinion additionally notes that *Krofft's* interpretation of *Dairy Queen* as providing for a right to a jury trial on a claim for disgorgement of profits has been repudiated by both the Supreme Court and this Court. *Id.* at 116; *see also Feltner*, 523 U.S. at 346 (describing *Dairy Queen* as an "action for damages for trademark infringement"); *Fifty-Six Hope Rd. Music*, 778 F.3d at 1075 (noting that "the Supreme Court characterizes the *Dairy Queen* claim as a legal claim for damages (not disgorgement of profits)").

In fact, in the nearly fifty years since *Krofft* was decided, no published decision from this Court has endorsed an expansive reading of its jury trial analysis. *Id.* at 116. Other courts, too, have declined to apply *Krofft's* conclusion on the Seventh Amendment right. *Id.*; *see also Fair Isaac Corp. v. Fed. Ins. Co.*, 408 F. Supp. 3d 1019, 1029 & n.9 (D. Minn. 2019) (rejecting the reasoning of *Krofft* and observing that "[i]t is telling that, in the more than forty years since [*Krofft*], no court has cited, much less adopted, its analysis"); *Siegel v. Warner Bros. Entm't Inc.*, 581 F. Supp. 2d 1067, 1073–74 (C.D. Cal. 2008) (distinguishing *Krofft* and

holding that "an accounting of profits between co-owners of a copyright" is an equitable remedy that does not trigger the jury trial right). As was the case in *JL Beverage Co.*, Cirrus Design's claim for monetary damages under the Lanham Act was solely in the form of disgorgement of profits, and as such, the Seventh Amendment did not provide the right to a jury trial.

## II. THE DISTRICT COURT APPLIED CORRECT STANDARDS IN ITS LIKELIHOOD OF CONFUSION ANALYSIS

### A. The District Court Did Not Improperly Limit the Scope of its Confusion Analysis

Cirrus Design organizes its trademark arguments around the bald assertion that the district court "misapplied the Lanham Act by failing to account for all types of confusion the statute is designed to protect against." Op. Br. at 24. This argument fails because the district court did not—explicitly or implicitly—limit its analysis to exclude consideration of whether likelihood of confusion could be shown by "affiliation, connection, or association" or "sponsorship" or "approval." To the contrary, the district court expressly considered those issues, evaluated in detail all the evidence Cirrus Design identifies as supposedly demonstrating likelihood of confusion through affiliation, and applied

controlling precedent using language this Court has used on many previous occasions.

To obtain the reversal that Cirrus Design seeks, it would be necessary for this Court to be "left with the definite and firm conviction that a mistake has been made." *Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1061 (9th Cir. 1999). Cirrus Design's arguments fall far short of meeting this standard.

### 1. The District Court Explicitly Analyzed Confusion in the Forms of Affiliation, Association, and Sponsorship

Cirrus Design claims that the district court "analyzed only confusion as to source or origin" and "failed to consider the other statutory types of confusion as to 'affiliation, connection, or association' or 'sponsorship' or 'approval.'" Op. Br. at 25 (quoting 15 U.S.C. § 1125(a)(1)(A)).

The trial order demonstrates that this assertion is incorrect. The language used by the district court explicitly recognizes that confusion relating to sponsorship, association, and affiliation all have a role in likelihood of confusion analysis.

When discussing intent in selecting the mark, the district court noted that, "[i]n a case of forward confusion—where consumers believe that goods or services bearing the junior mark came from *or were sponsored by* the senior mark holder—the court asks whether the defendant, in adopting its mark, intended to capitalize on the plaintiff's goodwill." 1-ER-30. (emphasis added). Cirrus Design's assertion that the district court ignored sponsorship or affiliation is disproven by this consideration of where goods or services "came from or were sponsored by."

The district court also considered evidence of "vendor confusion" in which a sales executive working on behalf of a professional hockey team contacted an executive at Cirrus Design "believing him to be *associated with* Cirrus Aviation." 1-ER-28 (emphasis added). The district court additionally discussed an email sent simultaneously by a vendor named Trustpilot to principals for both Cirrus Design and Cirrus Aviation asking whether Cirrus Aviation would be interested in using Trustpilot to boost its web traffic. *Id.* Both of these emails reflect instances in which companies were trying to sell services *to* Cirrus Aviation and contacted Cirrus Design, apparently in the mistaken belief that an association

existed between Cirrus Design and Cirrus Aviation. After considering all of the evidence at trial, the district court found this evidence to be unpersuasive in the likelihood of confusion analysis—not as strong as that which was presented in *Rearden LLC v. Rearden Com., Inc.*, particularly when considering the thirteen years of co-existence of Cirrus Design and Cirrus Aviation. 683 F.3d 1190, 1209 (9th Cir. 2012); 1-ER-28. Cirrus Design understandably feels disappointed that the district court found its evidence underwhelming, but its claim that the district court "considered only whether a consumer would be confused as to the source or origin of the product" is demonstrably incorrect. Op. Br. at 14.

The district court also quoted a portion of *Rearden* analyzing how "[a] Rearden Commerce employee admitted in his deposition that he was asked 'about a dozen times' in a trade show whether the companies were *somehow affiliated*." 1-ER-25; (emphasis added). The district court then proceeded to analyze evidence of purported non-consumer confusion presented by Cirrus Design, concluding that "the Court received no evidence that the difference between Cirrus Aviation and Cirrus [Design] then became 'the main question in the conference hallways' like the conference in *Rearden*." 1-ER-27. This language again reflects the district

court's understanding that "affiliation" between two companies, or questions about "the difference between" Cirrus Design and Cirrus Aviation, were an appropriate subject of likelihood of confusion analysis.

All of this language reflects proper application of trademark infringement law. The district court plainly understood that confusion between two trademarks can exist in the range of forms identified in the Lanham Act and expressly analyzed possible confusion as to association, sponsorship, or affiliation. The trial order was correct and certainly does not reflect clear error, as would be necessary to support reversal.

###### 2. The District Court Considered in Detail All the Evidence that Cirrus Design Claims Demonstrates Likelihood of Confusion

Cirrus Design accuses the district court of "failing to account for the ample undisputed evidence of confusion as to affiliation or connection between services provided by" the parties." Op. Br. at 34. Cirrus Design presents a lengthy citation to what it characterizes as "ample evidence" of such confusion, specifically referencing Cirrus Design trial exhibits 101–29, 131–33, 137, 139, 12, and 14. Op. Br. at 33–35. What Cirrus Design does not acknowledge is that the district court analyzed *all* of these exhibits—in detail—in the trial order.

Perhaps the longest and most detailed section of the trial order addresses purported evidence of actual confusion. 1-ER-24–28. The district court concluded that Cirrus Design "has not produced strong evidence of actual confusion, despite the thirteen years the companies have co-existed." 1-ER-26.

The district court organized its analysis of evidence of non-consumer confusion around this Court's decision in *Rearden LLC*, 683 F.3d at 1209. In a lengthy and detailed analysis, the district court considered each purported instance of non-consumer confusion offered by Cirrus Design, including all the evidence to which Cirrus Design now points on appeal. *Compare* Op. Br. at 33-35 *with* 1-ER-27–28.

Correctly framed, Cirrus Design's argument is not that the district court failed "to account for" its evidence, but instead that the district court found the evidence to be unpersuasive for the reasons articulated at length in the trial order. And the district court's assessment of the evidence and the reasons that the evidence failed to support Cirrus Design's claim of likelihood of confusion do not demonstrate clear error that would justify reversal.

### 3. The District Court's References to "Source" and "Origin" Do Not Reflect Improper Application of Trademark Law

Although accusing the district court of failing to consider forms of confusion beyond "source" and "origin" is a central theme of Cirrus Design's brief, it can point to vanishingly little in the trial court order to support the claim of error that it asserts.

This case is emphatically *not* similar to cases like *Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC*, 823 F.3d 153, 161 (2d Cir. 2016), despite Cirrus Design's attempt to equate the two. Op. Br. at 29. There the Second Circuit reversed a summary judgment order in which a district court explicitly and incorrectly held that "[t]he trademark infringement laws protect against confusion as to the source or origin of a product, not confusion about a product." *Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC*, No. 3:10-cv-01234 (MPS), 2014 WL 3891287, at *8 (D. Conn. Aug. 7, 2014). That language reflected a troublingly inaccurate application of trademark infringement standards that justified reversal.

The *Int'l Info. Sys.* case looks nothing like the trial order. Instead of identifying an explicit misstatement of the law, Cirrus Design resorts to

citing portions of the trial order and complaining that references to "source" or "origin" implicitly demonstrate that the district court committed reversible error because the trial order did not additionally add references to source, sponsorship, or affiliation. Op. Br. at 18 ("source"), 36 ("origin").

The precedent of this Court does not require trial orders to recite every form of confusion each time that likelihood of confusion is discussed. Indeed, Cirrus Design criticizes the language of the district court addressing evidence of actual confusion despite the trial order including language that closely tracks controlling precedent of this Court. *Compare* 1-ER-26. ("It is not apparent from this evidence that a reasonably prudent consumer in the marketplace is likely to be confused about the origin of their charter flight or personal aircraft.") with *Rearden*, 683 F.3d at 1209 (precedent "generally considers whether a reasonably prudent consumer in the marketplace is likely to be confused as to the origin or source of the goods or services bearing one of the marks or names at issue in the case.")

The precedent of this Court is inconsistent with the notion that usage of the terms "source" and "origin" implies exclusion of

consideration of the full range of types of confusion. This is evident from authority cited by Cirrus Design itself, including *Fleishmann Distilling Corp. v. Maier Brewing*, 314 F.2d 149 (9th Cir. 1963). Op. Br. at 28. In *Fleishmann*, this Court noted that, "[w]hen a newcomer takes the name Black & White and makes a use of it on a product which in the mind of the buyer *is related to or associated with* the product of the original trademark owner, we think it may be said that *confusion as to the source of origin is likely to result.*" *Id.* at 159 (emphasis added). Accordingly, the term "source of origin" was used in *Fleishmann* to encompass a range of types of confusion, including whether a junior user was related to or associated with a senior user.

Lest the language in *Fleishmann* be dismissed as an inaccurate relic of the past, that decision was cited by this Court in the case upon which Cirrus Design most heavily relies, *Brookfield Communications*. *See, e.g.,* Op. Br. at 28. Indeed, the *Brookfield* decision discussed the *Fleishmann* decision by again referencing the phrase "source of origin" in its likelihood of confusion analysis. 174 F.3d at 1057.

The precedent of this Court does not suggest that district courts must list every form of confusion at every stage of a likelihood of

confusion analysis. To the contrary, important controlling cases use terms like "origin" and "source of origin" to incorporate a range of forms of confusion. Cirrus Design has failed to demonstrate any misapplication of the law by the district court and certainly nothing that would rise to the level of establishing clear error.

## B. The District Court Properly Considered the *Sleekcraft* Factors

### 1. Strength of the Mark

The district court found the "strength of the mark" factor to be "neutral" in determining likelihood of confusion. 1-ER-21. The district court correctly assessed both the "conceptual strength" and the "commercial strength" of Cirrus Design's CIRRUS mark. 1-ER-17 (*citing JL Beverage Co., LLC*, 828 F.3d at 1106–07).

#### a. Conceptual Strength

Cirrus Design does not take issue with the district court's analysis of conceptual strength. The district court found the mark to fall "between suggestive and arbitrary" and thus "on the stronger end of the spectrum." 1-ER-19.

#### b. Commercial Strength

##### (i) *Commercial Strength in Context*

Cirrus Design first asserts that because it has advertised its mark and received various recognitions, the district court was required to find that it was generally commercially strong throughout all of aviation, without considering the mark "in context." Op. Br. at 38–39.

What Cirrus Design functionally argues is that the district court was required to make no distinction between aircraft manufacture and charter flight operations in assessing commercial strength. That analytical framework is incorrect. The commercial strength of a mark is not determined in a vacuum. It is well-established that a mark can be strong in one market and weak in another. *See* 2 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 11:77 (5th ed. 2022) (collecting cases); *Checkpoint Sys., Inc. v. Check Point Software Tech.*, 269 F.3d 270, 283 (3d Cir. 2001) (despite spending millions of dollars on advertising, plaintiff's mark was strong in the physical article security market but not in other segments of corporate security); *Homeowners Group, Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1107 (6th Cir. 1991) (a mark may "have high recognition which is limited to a particular product or market segment").

In applying the "flexible" and fact-based *Sleekcraft* analysis under which the factors "are intended to function as a proxy for consumer confusion," it was entirely appropriate for the district court to look beyond Cirrus Design's claim of generalized commercial strength and consider whether that strength extended into the market for charter air travel in which Cirrus Aviation participates. *Rearden*, 683 F.3d at 1209. The district court correctly determined, based on the evidence presented at trial, that the markets for personal aircraft and charter flights attract different types of customers, and accordingly, strength in the personal aircraft market does not equate to strength in the charter market. 1-ER-20. Cirrus Design had the opportunity to demonstrate the strength of its mark within the charter flight market but did not offer evidence showing how much of the charter market its planes occupy, nor of any advertising it has done in that field. 1-ER-20.

(ii)    *Other Uses of "Cirrus" in Aviation*

In its post-trial motion, Cirrus Design began its conclusion by asserting that, "Cirrus Design is *the* CIRRUS in all of aviation." 2-ER-126 (emphasis in original). On appeal, Cirrus Design now argues, apparently without irony, that the district court was prohibited from

considering evidence that several other companies have long used the CIRRUS mark within aviation.

The district court found that several third-party companies have made longstanding use of the CIRRUS mark within different segments of aviation. Cirrus Flight Operations began offering a variety of aviation services *including operating charter flights* starting in 1978—years before the creation of Cirrus Design. 1-ER-13; 4-ER-580–632. Cirrus Flight Operations operates from a small airport located in Blaine, Minnesota, relatively close to Cirrus Design's longtime headquarters in Duluth, Minnesota. 1-ER-13; 4-ER-582–83; 5-ER-814-15. The district court also noted the existence of Cirrus Aviation, Inc. (with locations in New Jersey and Arizona) that buys and sells turbine engines and related equipment. 1-ER-13; 7-ER-1199–1213 The district additionally discussed Cirrus Aviation, Incorporated (based in Florida) that operates a flight training company and pilot shop. 1-ER-13; 7-ER-1216–65.

Cirrus Design argues that the district court was prohibited from considering the operations of these companies. Cirrus Design frames consideration of third-party uses of a mark as a suspicious practice,

permissible only where specific facts demonstrating a "crowded field" exist. Op. Br. at 39.

This assertion is incorrect. Courts frequently consider other uses of the same or similar marks when assessing commercial strength without requiring the specific circumstances of a "crowded field." *M2 Software, Inc. v. Madacy Ent.*, 421 F.3d 1073, 1088 (9th Cir. 2005) (holding that use of similar marks by third-parties weakens the mark at issue, with no mention of a need for specific facts constituting a "crowded field" or widespread recognition of the third-party use); *Gen. Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 626–27 (8th Cir. 1987) ("evidence of third party usage of similar marks on similar goods is admissible and relevant to show that the mark is relatively weak and entitled to a narrower scope of protection") (citing *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 259–60 (5th Cir. 1980), *cert. denied*, 449 U.S. 899 (1980)).

Cirrus Design also claims that the third-party uses could not be considered because of a lack of evidence of use of the CIRRUS mark by those companies, relying on *Scarves by Vera, Inc. v. Todo Imps. Ltd. Inc.*, 544 F.2d 1167, 1173 (2d Cir. 1976). Op. Br. at 40. In the *Vera* case a defendant attempted to prove uses by other parties by relying on a list of

entities that had registered a mark that included the word "Vera." *Id.* at 1173. The court concluded that the defendant had not presented evidence that those third parties had even *used* the registered marks, much less how they had been used. *Id.* Here, the factual record is very different. Through a combination of live testimony, deposition transcripts, and exhibits, the district court found use and promotion of the CIRRUS mark by other companies in aviation. 1-ER-13. That evidence collectively demonstrated decades-long active and ongoing use of the CIRRUS mark by multiple entities. 1-ER-13, 20–21. The district court ultimately gave some weight to the evidence in weakening the strength of Cirrus Design's mark, "albeit less [] than if they were larger companies." 1-ER-21.

The district court carefully reviewed the evidence presented at trial, weighed that evidence against proper legal standards, and reached the conclusion that the "strength of the mark" factor is "neutral" in this case. Cirrus Design cannot demonstrate that this determination was the product of clear error.

### 2. Competitive Proximity of the Services

The district court determined, applying this Court's "flexible approach," that this factor weighs in favor of Cirrus Aviation. 1-ER-23.

a. Cirrus Design Advocates for a Rote Disjunctive Test

Goods and services are related when they are complementary, similar in use or function, or sold to the same class of purchasers. (Order at 13) (*citing Ironhawk Techs., Inc. v. Dropbox, Inc.*, 2 F.4th 1150, 1163 (9th Cir. 2021)). Cirrus Design's primary argument on appeal is that this standard—at least when stated in the *Ironhawk* case—is written in *disjunctive* language. Cirrus Design asserts that the district court incorrectly applied a *conjunctive* test. Op. Br. at 43. Cirrus Design insists that once the district court found that the goods and services were complementary, "the District Court's analysis on this factor should have ended there with a finding in favor of Cirrus [Design]." Op. Br. at 43.

Cirrus Design's analysis is directly inconsistent with decades of precedent about analysis under the *Sleekcraft* factors, which "are intended as an adaptable proxy for consumer confusion, not a rote checklist." *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1145 (9th Cir. 2011) (collecting cases). "These tests were not meant to be requirements or hoops that a district court need jump through to make the determination." *Eclipse Assoc. Ltd. v. Data Gen. Corp.*, 894 F.2d 1114, 1118 (9th Cir. 1990). This flexible approach was

used by this Court when performing a combined analysis of the proximity of goods and marketing channels factors in *Nutri/Sys., Inc. v. Con-Stan Indus., Inc.*, 809 F.2d 601 (9th Cir. 1987). There, this Court affirmed a district court finding of no likelihood of confusion, where it had found that "similarities exist between" the parties' services, but "that they differ significantly in the method of operation, the socioeconomic customer group served and the facilities in which they offer their services." *Id.* at 606. Far from halting the analysis after determining that the parties had similar offerings, this Court properly analyzed the relevant facts.

Similarly here, the district court did *not* treat the test for relatedness of goods and services as a rote disjunctive checklist. Instead, the district court analyzed the facts, finding that Cirrus Design's purchasers "largely want to be pilots" and that Cirrus Aviation purchasers "largely want to be passengers." 1-ER-22. The district court noted that the two companies "offer different experiences to purchasers" and that their respective customer bases have very different priorities. *Id.*

The respective service offerings of Cirrus Design and Cirrus Aviation merit detailed examination, particularly in light of Cirrus

Design's counter-factual claim that the parties "provide identical services for FAA-certified aircraft." Op. Br. at xi. The district observed that while both companies offer services relating to airplane acquisition, airplane maintenance, airplane management, and pilot training services, those offerings are functionally very different from one another because the companies "only offer these services to existing customers (or in the case of Cirrus Aviation's pilot training, to potential employees) not to the public." 1-ER-22. To provide additional context, Cirrus Aviation provides these services only in connection with aircraft that are already part of, or entering the fleet of, aircraft that it uses to make money through charter operations. 3-ER-289–90; 4-ER-486–95. As an incentive to attract employee pilots willing to fly its planes, Cirrus Aviation offers training through which pilots can satisfy their training requirements while operating planes in the charter fleet. 3-ER-335–36; 4-ER-466–67. *None* of these services involve aircraft built by Cirrus Design, because Cirrus Aviation has never and will never include Cirrus Design planes in its charter fleet. 4-ER-478. Cirrus Design offers its own suite of services, which collectively exist for the purpose of selling more planes built by

Cirrus Design. 4-ER-661–62. Its maintenance and pilot training services are provided with respect to Cirrus Design aircraft. 29-ER-5795–96.

After a full analysis "[u]nder the Ninth Circuit's flexible approach," the district court found that "[b]ecause the two companies have different classes of purchasers, the complementary nature of their respective planes and flights is lessened, and their use and function more dissimilar" and that "[t]his factor weights in favor of Cirrus Aviation." 1-ER-23.

The district court appropriately applied the flexible analysis long embraced by this Court to reach its conclusion. Indeed, this Court previously reversed a district court's overly rigid decision finding that because the parties' products were somewhat related, the proximity of goods factor favored a finding of likelihood of confusion as a matter of law. *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1147–48 (9th Cir. 2002). Here, the district court applied its factual findings to precedent appropriately and no clear error can be demonstrated.

### b. Failing to Consider All Types of Confusion

Cirrus Design repeats its claim that the district court failed to consider all types of possible confusion, specifically taking issue with a

sentence in the trial order stating that related goods or services are those which "would reasonably be thought by the buying public to come from the same *source* if sold under the same mark." Op. Br. at 44 (*citing* 1-ER-21) (emphasis in original). Cirrus Design claims that this sentence "directly contradicts this Court's precedent and the Lanham Act" and indicates that that the district court failed to consider other types of possible confusion. Op. Br. at 44.

The sentence used by the district court was a direct quotation from this Court's decision in *Rearden*. 1-ER-21 (*citing Rearden*, 683 F.3d at 1212–13). And the *Rearden* court was, in turn, quoting that language from the tenth footnote in *Sleekcraft* itself. *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348 n.10 (9th Cir. 1979). The language that Cirrus Design contends contradicts precedent is, in fact, a quotation from perhaps the most foundational controlling precedent governing likelihood of confusion.

As is discussed above, the text of the trial order reflects consideration of all forms of confusion and the district court carefully analyzed all evidence of supposed confusion offered by Cirrus Design.

Nothing about the district court's analysis of proximity of goods reflects clear error or justifies reversal.

### c. The TTAB Proceeding

Cirrus Design uses the proximity of goods factor as an opportunity to mischaracterize the parties' proceedings before the TTAB. Op. Br. at 42.

For many years, Cirrus Design and Cirrus Aviation co-existed without friction. In 2015, Cirrus Design applied to obtain registration of the CIRRUS mark for an expanded group of goods and services that included "Providing Supplemental Lift Scheduling in the Nature of Scheduling Alternate Flights or Charter Flights" and "Business Management Services in Nature of Private Aircraft Management Services…" 10-ER-1961–74.

Out of concern that Cirrus Design was attempting, for the first time, to obtain trademark rights within the sphere of charter operations, Cirrus Aviation filed a Notice of Opposition to the requested registration with the Trademark Trial and Appeal Board ("TTAB"). 10-ER-2039–54. Cirrus Aviation stated that with respect to its own goods and services, it had valid common law rights in the trademarks at issue. *Id.* Cirrus

Aviation additionally argued that if Cirrus Design was to expand into the separate sphere of charter operations and related services, where it had never operated, it could cause confusion in the marketplace. 10-ER-2041–42, ¶ 4. As Greg Woods explained at trial, "we're contesting their expansion from being a manufacturer to being an airline." 3-ER-348.

Nothing about these facts supports the distorted picture Cirrus Design presents of the proceedings before the TTAB. Cirrus Design's appeal brief mischaracterizes a quotation from the fourth paragraph of the Notice of Opposition, claiming Cirrus Aviation "told the USPTO, that the similarities between the federally registered Cirrus Aircraft mark and [Cirrus Aviation's] mark were so similar 'it is likely that members of the public will erroneously believe that [Cirrus Design's] services originate with or are in some way connected or associated with, or sponsored by, [Cirrus Aviation].'" Op. Br. at 42.

This assertion misstates the actual content of the fourth paragraph of the Notice of Opposition, which addressed a likelihood of confusion "between Cirrus Aviation's Goods and Services as identified by the CIRRUS Marks and *the goods identified in the Application."* 10-ER-2041 (emphasis added). Thus, just as Greg Woods testified, the fourth

paragraph of the Notice of Opposition raised the prospect of confusion if Cirrus Design was allowed to obtain rights within the new charter-related goods and services for which its application sought registration.

Notably, Cirrus Design's description of proceedings before the TTAB does not include acknowledgement that Cirrus Design responded to the Notice of Opposition by *denying* paragraph four. *Compare* 10-ER-2041 to 10-ER-2057. Thus, to the extent the TTAB proceeding is probative of anything in this litigation, the parties' pleadings ended with Cirrus Design *denying* a likelihood of confusion between the parties' products and services. *Id.*

At trial, the parties provided extensive evidence regarding their service offerings. What became clear is that they currently offer different things to different people and do not overlap. The district court correctly applied precedent to conclude that under the Ninth Circuit's flexible approach, the parties' offerings would not reasonably be thought by the buying public to come from the same source.

### 3. Similarity of the Marks

The district court determined that the similarity of the marks factor weighs in favor of Cirrus Design. 1-ER-23–24. Cirrus Design

nevertheless asserts that the district court "failed to correctly account for how similar the marks really are." Op. Br. at 45.

Cirrus Design fails to identify what, specifically, the trial order got wrong. Should the district court have found that this factor *strongly* favors Cirrus Design? Should this factor have been weighed more heavily in the likelihood of confusion analysis? Cirrus Design chooses not to take any specific position at all, much less to demonstrate how the district court's analysis might reflect clear error.

Cirrus Design also makes the odd and improper decision to invite this Court to compare two different websites that it alleges are "virtually identical." Op. Br. at 46, n.2. This Court cannot do so because, "[p]apers not filed with the district court or admitted into evidence by that court are not part of the clerk's records and cannot be part of the record on appeal." *Kirshner v. Uniden Corp. of America*, 842 F.2d 1074, 1077 (9th Cir. 1988).

### 4. Evidence of Actual Confusion

The district court found that this factor favors Cirrus Aviation. 1-ER-29. Cirrus Design's arguments about actual confusion simply repackages its arguments that the district court failed to consider all

different types of potential confusion. As is discussed in detail above, this is incorrect. The trial court order reflects the district court's explicit consideration of all types of confusion, as well as its detailed analysis of all of the evidence of supposed consumer and non-consumer confusion offered by Cirrus Design.

The district court found that Cirrus Design "has not produced strong evidence of actual confusion, despite the thirteen years the two companies have co-existed." 1-ER-26. This unusually long period of co-existence is telling; this Court previously observed the co-existence of two parties using the same trademark for six years, noting that, "[u]nder these circumstances, some evidence of actual confusion should have become available if [the defendant's] coexisting use had created a genuine likelihood of confusion." *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 842–43 (9th Cir. 2002) (citing *Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 228 (2d Cir. 1999). The weak evidence presented by Cirrus Design, combined with the very long period of co-existence, fully supports the district court's conclusion.

A notable fact not addressed in the trial order—but which nevertheless supports the district court's conclusion—is Cirrus Design's

failure to present trademark survey evidence. Despite being involved in a long-running trademark infringement litigation—and despite having expected revenue of $750 million in 2022—Cirrus Design presented no survey evidence to support its claim of likelihood of confusion. 29-ER-5852–53. Other courts have repeatedly observed that the absence of trademark survey evidence—particularly where a plaintiff has the resources to afford to obtain such evidence if it was available—supports a finding that the actual confusion factor favors the defendant. *Playboy Enterpr., Inc. v. Netscape Commc'ns Corp.*, 55 F. Supp. 2d 1070, 1084 (C.D. Cal. 1999), *aff'd* 202 F.3d 278 (9th Cir. 1999); *Cairns v. Franklin Mint Co.*, 24 F. Supp. 2d 1013, 1041–42 (C.D. Cal. 1998) ("Survey evidence is not required . . . but it is often the most persuasive evidence. . . . Consequently, a plaintiff's failure to conduct a consumer survey, assuming it has the financial resources to do so, may lead to an inference that the results of such a survey would be unfavorable."). *See also, e.g., Merriam-Webster, Inc. v. Random House, Inc.*, 35 F.3d 65, 72 (2d Cir. 1994) ("The lack of survey evidence counts against finding actual confusion.")

The district court correctly held that the actual confusion factor favors Cirrus Aviation and committed no clear error.

### 5. Marketing Channels Used

This factor assesses whether the parties' marketing channels, consumer bases, and the ways in which they advertise their products overlap. 1-ER-28 (*citing Ironhawk*, 2 F. 4th at 1166). The district court determined that this factor favors Cirrus Aviation. 1-ER-29.

The district court analyzed the marketing channels of the parties, finding that they "do not appear to significantly overlap." *Id.* The trial order found that "certain of their marketing is of the same type—referrals and websites" but that it is "not obvious that their referral networks would overlap" and that the district court "has not received compelling evidence that they do." *Id.* In a notable example, the district court found that about 70% of Cirrus Aviation's flights are sold to charter brokers. *Id.* Cirrus Design presented no evidence that it sells *anything* to charter brokers, reflecting the substantial dissimilarity of the parties' marketing channels.

Cirrus Design nevertheless argues that it offered "substantial proof on this factor." Op. Br. at 48. It primarily points to two subjects: (1)

similarity of names in customer databases; and (2) both companies having websites.

## a.  Database Names

Cirrus Design claims that the "unrebutted evidence was that there are over 240 overlapping customers" between the two companies. Op. Br. at 48. That is decidedly *not* what the district court found. To the contrary, the district court found that although some similar names appeared in the two customer databases for the companies, evidence had not demonstrated that these names actually referred to the same *people*. As stated in the trial order, "the Court has received no evidence that the Michael Smith on Cirrus Aviation's customer list is the same person as the Michael Smith on Cirrus [Design's]." 1-ER-29. It was incumbent upon Cirrus Design to present evidence at trial demonstrating whether any actual customer overlap—not merely the existence of similar names in databases—existed between the two companies. Having failed to do so, no clear error in the district court's analysis can be found.

## b.  Similar Websites

Cirrus Design additionally points to the fact that the parties' websites are similar in name, look, and feel. Op. Br. at 48. The district

court acknowledged this, but found, after considering the evidence presented at trial, that "it is not clear that either party relies heavily on its [web]site for sales." 1-ER-29. Instead, both companies make more than half of their sales based on referral networks that do not overlap. *Id.*

The district court also correctly noted that simply having websites is not enough to demonstrate use of the same marketing channels. 1-ER-29; *see also Network Automation, Inc.* 638 F.3d at 1151 ("Today, it would be the rare commercial retailer that did not advertise online, and the shared use of a ubiquitous marketing channel does not shed much light on the likelihood of consumer confusion.").

Cirrus Design claims that the district court committed an error by applying a "mistaken sale" test relating to the websites when the court noted that "'having similarly named and looking websites might result in a person going to the wrong website, [but] the Court is not convinced that the misdirection would result in a mistaken sale.'" Op. Br. at 48 (quoting 1-ER-29.) This argument is incorrect. This *Sleekcraft* factor considers "whether the parties' customer bases overlap and how the parties advertise and market their products." *Ironhawk*, 2 F.4th at 1166. Cirrus

Design effectively argues that the district court should have disregarded precedent by treating the existence of similar looking websites as a critical, dispositive fact despite evidence that those websites would *not* lead to overlapping customer bases. The district court properly chose not to adopt that improper approach.

The district court correctly found that the parties sell different things, through different channels, to different customer bases. Its conclusion that this factor favors Cirrus Aviation does not reflect clear error.

### 6. Types of Goods and Services and Degree of Care

This factor requires the court to assess customers' sophistication and ask whether a reasonably prudent customer would take the time to distinguish between the two product lines. 1-ER-29 (*citing Ironhawk*, 2 F.4th at 1167). The district court found this factor to "weigh in Cirrus Aviation's favor because Cirrus Design's planes and Cirrus Aviation's flights are both very expensive and marketed to expert buyers." 1-ER-29.

The district court applied precedent correctly. Where the purchasers of a good or service are sophisticated and where the goods or services offered are expensive, this factor weighs against finding a

likelihood of confusion. *Interstellar Starship Servs., Ltd.*, 184 F.3d at 1110 ("Sophisticated purchasers of expensive goods should eventually be able to find exactly what they are searching for."). *See also Sleekcraft*, 599 F.2d at 353 ("When the buyer has expertise in the field, a high standard is proper though it will not preclude a finding that confusion is likely."); *Brookfield Commc'ns, Inc.*, 174 F.3d at 1060 (a buyer can be expected "to be more discerning—and less easily confused—when he is purchasing expensive items . . . and when the products being sold are marketed primarily to expert buyers.") (internal citation omitted).

The evidence presented at trial shows that Cirrus Aviation sells a luxury charter service for which customers pay tens of thousands of dollars for private air travel. 3-ER-316–17. About 70% of its flights are sold to professional charter brokers. 3-ER-303. Combined together, charter brokers and business intermediaries like casino flight departments and artist tour managers control the purchases of "in excess of 90 percent" of Cirrus Aviation's flights. 3-ER-312–13. All quotes for Cirrus Aviation flights include both photographs of the aircraft to be flown and written identification of the aircraft, making it effectively

impossible for a purchaser to book a flight while under the impression that a plane built by Cirrus Design would be flown. 3-ER-306–07.

The evidence at trial demonstrated that Cirrus Design's piston aircraft sell for more than $1 million each and that its Vision Jet regularly sells for more than $3 million. 5-ER-854. It was "part of the designing philosophy and market goals of the company" for Cirrus Design aircraft to be "owner flown." 4-ER-646. They are sold for the purpose of being piloted by their owners, requiring a lengthy and involved process of qualification. *Id.*; 4-ER-649–50. Because owning an aircraft involves so many responsibilities—like qualifying to pilot it, maintaining it, and housing it in an appropriate hangar—Cirrus Design has offered services designed to reduce the barrier to purchase created by these obligations. 4-ER-658–59; 5-ER-778–79, 834–35.

On appeal, Cirrus Design makes no attempt to dispute the expensive nature of the parties' offerings, nor to deny the expert nature of their buyers. Instead, its argument on appeal focuses on the possibility that even wealthy and sophisticated people could be confused regarding the ancillary services Cirrus Design offers of aircraft management, maintenance, acquisition services, and flight training. Op. Br. at 49. But

the district court found that Cirrus Design and Cirrus Aviation "offer these services to existing customers (or in the case of Cirrus Aviation's pilot training, to potential employees), not to the public. 1-ER-22. Indeed, a person who has already paid $3 million to purchase a Cirrus Vision Jet aircraft and is using Cirrus Design's aircraft management services for it is perhaps the clearest example of a wealthy, expert consumer who would know very well that charter flights aboard the large commercial planes operated by Cirrus Aviation have no connection or affiliation.

Perhaps more clearly than any other factor, type of goods and degree of care swings decisively in favor of Cirrus Aviation. The district court's unchallenged factual findings and its conclusions of law are correct, reflecting no clear error that might justify reversal.

## 7.  Intent

At trial, the district court heard the testimony of the parties and had the opportunity to assess the credibility of witnesses, ultimately concluding that the intent factor weighs in favor of Cirrus Aviation. 1-ER-29–30.

When assessing intent in a case of alleged forward confusion like this one, courts ask "whether defendant in adopting its mark intended to

capitalize on plaintiff's good will." *Marketquest Grp., Inc. v. BIC Corp.*, 862 F.3d 927, 934 (9th Cir. 2017) (quoting *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1043 (9th Cir. 2010)).

Cirrus Design characterizes the district court's conclusion as incorrect, asserting that: (1) knowledge of the existence of the senior mark at the time of adoption is alone dispositive on this factor; and (2) assessment of knowledge here must be made as of 2010, ignoring the fact that the Woods family had been using the "Cirrus Aviation" name for a different business since 1994.

### a.   The Relevant Facts

Cirrus Aviation is a family business owned by Milt Woods and his sons, Greg and Mark. 1-ER-14. After decades as a commercial pilot, Milt Woods decided to start his own aircraft management company in 1994, naming it "Cirrus Aviation Services, Inc." *Id.* The district court found that as of 1994, neither Milt, nor Mark, nor Greg knew about the existence of Cirrus Design. *Id.* That is unsurprising because Cirrus Design was still in relative infancy in 1994—the district noted that at that time Cirrus Design had not yet obtained Federal Aviation

Administration certification for any aircraft, nor had it registered any trademarks. 1-ER-31.

The Woods family operated the Cirrus Aviation Services, Inc. business in a number of ways, including operating a Canadian charter company, taking partial ownership of a Las Vegas-based charter company, and brokering charter flights. 1-ER-14. In 2010, the Woods family took the leap of acquiring a company that held a Part 135 certificate—required by the FAA to operate charter flights. 1-ER-15. The seller of that company, called Great Western Air, LLC, required that the Woods family do business under a different name because of his ongoing use of the "Great Western Air" name with other businesses. *Id.*

When, in 2010, the family decided to name the acquired business "Cirrus Aviation Services, LLC," it did so because Milt Woods was proud of the name he had been using for his other business since 1994, wanted to keep it to maintain his customer base, and liked the association with the cloud. *Id.* The district court specifically found this explanation for the family's selection of the Cirrus Aviation name to be credible. 1-ER-31. The district court found that Greg Woods searched the Air Charter Guide in 2010 to see whether any Part 135 operators were already using the

"Cirrus" name, finding none, but that he did not conduct a trademark search.

The Woods family acknowledged at trial that by 2010 they were aware of the existence of Cirrus Design, but they did not think the existence of that company was a concern because Cirrus Design only made small piston aircraft rather than the larger commercial aircraft that the Woods family was interested in. 1-ER-15. In addition to finding the explanation of Cirrus Aviation for selecting its name credible, the district court found that, as of 2010 (a time when Cirrus Design only offered single-engine propeller aircrafts with four or five seats) "it is not clear to the Court that Cirrus Aviation's fledgling charter operation would have benefited from being associated with Cirrus [Design]." 1-ER-31.

b.  Knowledge Alone is Insufficient

Cirrus Design's strategy on appeal is to oversimply both the facts and the law in an effort to obtain reversal, claiming that the Woods family's admitted knowledge of the existence of Cirrus Design in 2010 means the intent factor favors Cirrus Design. This is incorrect.

This Court has repeatedly found no intent to capitalize on a senior user's good will even when the junior user had actual knowledge of the senior use. *M2 Software, Inc.*, 421 F.3d at 1085 (no intent even though junior user was aware of senior user before selecting mark because of absence of evidence that junior user "had any intention of capitalizing on M2 Software's trademark"); *One Indus., LLC v. Jim O'Neal Distrib., Inc.*, 578 F.3d 1154,1162–64 (9th Cir. 2009) (lack of evidence of intent to deceive, despite knowledge of plaintiff's mark, supported conclusion that this *Sleekcraft* factor weighed in favor of alleged infringer). Even in *Brookfield*, a case Cirrus Design cites attempting to support its argument, the junior user *did* "know of Brookfield's claim to rights in the trademark" at the time of launching its website, but this Court still found that "intent does not appear to bear upon the likelihood of confusion" because the defendant "did not act with such an intent from which it is appropriate to infer consumer confusion." *Brookfield Commc'ns, Inc.*, 174 F.3d at 1059–60.

The district court, in its role of finding the facts and assessing the credibility of witnesses, found testimony credible that Cirrus Aviation did *not* intend to capitalize on the good will associated with Cirrus Design,

either when first using the "Cirrus Aviation" name in 1994 or when choosing to use that name with its newly acquired charter business in 2010. 1-ER-14–15, 31. This determination of credibility is not the product of clear error and reflects that the district court correctly found the intent factor to favor Cirrus Aviation.

c.  Events Prior to 2010

Cirrus Design also insists that it is "irrelevant, and has no basis in this Court's precedent, that Milt Woods liked the name 'CIRRUS' and had previously used the name for other businesses." Op. Br. at 52.

It is, instead, the argument of Cirrus Design that is unsupported by precedent. This Court has previously observed that, "no specific type of evidence is necessary to establish intent, and the importance of intent and evidence presented will vary by case." *Marketquest* 862 F.3d at 935. Here, the district court appropriately considered and found credible Cirrus Aviation's explanation for how its name was selected. No precedent of this Court suggests that the district court was required to turn a blind eye to pre-2010 events that were critically probative of intent.

The Court made no error of any kind and certainly no error that would support appellate relief when weighing this factor in support of Cirrus Aviation.

### 8. Likelihood of Expansion

In the context of non-competing goods and services like those at issue here, a "strong possibility" that either party may expand its business to compete with the other will weigh in favor of a finding that present use is infringing. 1-ER-32( *citing Ironhawk*, 2 F.4th at 1168). Concrete evidence of expansion plans—not mere speculation of possible expansion—is what matters for this factor. *Id.* (*citing Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 634 (9th Cir. 2005)). After considering the evidence at trial—including assessing the credibility of Cirrus Design's insistence of its great interest in expansion into the charter space—the district court found that this factor favors Cirrus Aviation. 1-ER-32–33.

The district court noted as a preliminary matter that it did not find Cirrus Design and Cirrus Aviation to be competitors because "the companies sell to different classes of purchasers and offer their ancillary services only to their customers." 1-ER-32. The district court further

noted that while the ancillary services that each company offers are identical, these services are not competitive because "neither company offers them to the public." *Id.*

To prevail on this factor, it was incumbent upon Cirrus Design to produce evidence of actual, non-speculative plans to expand into the charter space. Although Cirrus Design claims on appeal to have presented evidence that the district court "ignored," the trial order reflects explicit consideration of much of this evidence. *Compare* Op. Br. at 53-54 with 1-ER-32–33. Other facts onto which Cirrus design attempts to cling—like its brief ownership of a 21% interest in a failed "air taxi company" called SATSair from 2006 to 2010—are so thoroughly irrelevant to demonstrating concrete plans of expansion that the district court appropriately chose not to devote space in the trial order to addressing them. Op. Br. at 6.

The district court found that Cirrus Design did not provide any evidence that Cirrus Aviation intends to manufacture aircraft, 1-ER-32, and failed to provide concrete plans of expansion into charter. 1-ER-33. The district court also noted that because of its foreign ownership, Cirrus Design cannot legally hold the Part 135 certificate required under FAA

regulations to operate charter flights. In reaching its decision, the district court weighed the evidence and assessed the credibility of Cirrus Design. Despite hearing Cirrus Design's protestations that "it is interested in expanding into charter" the district court noted that no legal obstacle prevents Cirrus Design from becoming a charter broker, yet it has never brokered a charter flight. 1-ER-33.

The district court appropriately deemed Cirrus Design's claimed interest in expanding into charter "speculative" and found that this factor favors Cirrus Aviation. That determination was not the product of clear error.

## C.  Weighing the *Sleekcraft* Factors

After completing its carefully considered analyses of each of the *Sleekcraft* factors, the district court weighed the evidence in total, concluding that Cirrus Design "did not meet its burden of proving its claims by a preponderance of the evidence." 1-ER-33.

Cirrus Design claims error by objecting that the district court "seemingly weighed all factors equally and failed to analyze the factors [sic] weighted importance." Op. Br. at 56. This Court, however, has expressly stated that such analysis is *not* required. *Allstate Ins. Co. v.*

*Kia Motors Am., Inc.*, 784 F. App'x 507, 510–11 (9th Cir. 2019). "[W]e do not require the District Court, after careful consideration of each factor, to explain with particularity how it weighed the factors in relation to one another. That would go beyond the scope of our clear-error review." *Id.*

## D. Cirrus Design is Not Entitled to an Injunction

Cirrus Design argues that that the district court erred in refusing to issue a permanent injunction. Op. Br. at 57. This argument fails because Cirrus Design cannot show that the district court abused its discretion by denying its request for an injunction.

The decision to issue a permanent injunction in a trademark infringement action lies within the discretion of the district court. *Reno Air Racing Ass'n., Inc.*, 452 F.3d at 1137–38 (decision to grant permanent injunctive relief is an act of "equitable discretion" by the district court); *Pyrodyne Corp. v. Pyrotronics Corp.,* 847 F.2d 1398, 1402 (9th Cir. 1998) ("[T]he grant of injunctive relief is not a ministerial act flowing as a matter of course."). "Mere disagreement with the district court's conclusions is not sufficient reason for [this Court] to reverse the district court's decision regarding a preliminary injunction." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1195 (9th Cir.

2024) (quoting *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.* 422 F.3d 782, 795 (9th Cir. 2005).

Here, after considering the facts and evidence presented by the parties and applying the Lanham Act and *Sleekcraft* factors, the district court properly determined that there was no infringement that warranted the issuance of a permanent injunction. Because Cirrus Design has identified no clear error that would provide a basis to reverse the district court's determination of no likelihood of confusion—and because it has additionally not proven that the district court's decision to decline to issue a permanent injunction constituted clear error—the trial order should be affirmed in all respects.

## CONCLUSION

For the foregoing reasons, the district court's trial order, as well as its order striking Cirrus Design's jury demand, should be affirmed in all respects.

Dated: June 17, 2024           Respectfully submitted,

*/s/ Mark J. Connot*

**FOX ROTHSCHILD LLP**

# WORD COUNT CERTIFICATION

I, Mark J. Connot, in accordance with Rule 202.8-b of the Uniform Civil Rules for the Supreme Court & The County Court, certify that the foregoing memorandum of law contains 13,262 words, as counted by Microsoft Word's word-processing system, excluding the caption, date, and signature, and is in compliance with Rule 202.8-b.

Dated: June 17, 2024                          Respectfully submitted,

_/s/ Mark J. Connot_
**FOX ROTHSCHILD LLP**

## CERTIFICATE OF SERVICE

I hereby certify that on June 17, 2024, I electronically filed the foregoing Appellee's Response Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system, which will accomplish service on counsel for all parties through the Court's electronic filing system.

*/s/ Mark J. Connot*

Mark J. Connot
*Attorney for Defendant-Appellee*